# In the United States Court of Federal Claims

No. 14-132 C
May 26, 2016

| | |
|---|---|
| TABETHA JENNINGS,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Breach of Contract;<br>Contracts of Adhesion;<br>Due Process Clause;<br>RESTATEMENT (SECOND) OF CONTRACTS<br>§ 78 cmt. c (Unenforceable Promises);<br>§ 79 cmt. e (Gross Inadequacy of Consideration);<br>§ 86 cmt. c (Unenforceable Contracts);<br>28 U.S.C. § 1491 *et seq*. (Tucker Act Jurisdiction);<br>41 U.S.C. § 7102 *et seq*. (Contract Disputes Act). |

**James A. Simpson, Jr.**, Simpson & Simpson, Searcy, Arkansas, Counsel for Plaintiff.

**Rebecca Sarah Kruser**, United States Department of Justice, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S PENDING MOTIONS AND REQUIRING THE GOVERNMENT TO SHOW CAUSE WHY THE COURT SHOULD NOT DETERMINE THAT SECTIONS C.2.10, C.3.1(6), AND C.3.4(j) OF THE MARCH 9, 2012 CONTRACT ARE UNLAWFUL AND UNENFORCEABLE

**BRADEN**, *Judge*.

## I. RELEVANT FACTUAL BACKGROUND.[1]

On March 9, 2012, the United States Postal Service ("USPS") renewed contract No. HCR-726A1 (the "Contract") with Ms. Tabetha Jennings to provide daily mail transportation services

[1] The relevant facts discussed herein were derived from: Ms. Jennings' July 21, 2014 Amended Complaint ("Am. Compl."), the Exhibits attached to the Amended Complaint ("Am. Compl. Exs. 1–8"); the Government's November 13, 2015 Motion For Summary Judgment ("Gov't SJ Mot.") and Appendix attached thereto ("Gov't App. A1–77"); the Government's November 13, 2015 Proposed Findings Of Uncontroverted Fact ("GPFUF"); Ms. Jennings' December 14, 2015 Response to the Government's Motion For Summary Judgment ("Pl. Resp.")

from Leslie, Arkansas to Timbo, Arkansas for $34,000 per year. Gov't App. A1–48, A59; *see also* Am. Compl. Ex. 1. Prior to that time, Ms. Jennings served seven years as a rural contract carrier for the USPS without any issues related to her performance. Am. Compl. ¶¶ 4–5. On February 21, 2013, Ms. Jennings was terminated for "failure to perform in accordance with the terms of [the] [C]ontract." Gov't App. A66.

### A. The Contractual Provisions At Issue.

The Contract consisted of a thirteen page "Statement of Work and Specifications" that prefaced thirty-five additional pages of boilerplate "Terms and Conditions." Gov't App. A1–48. The Contract term was from April 1, 2012 to March 31, 2018. Am. Compl. ¶ 5. The provisions relevant to the Memorandum Opinion And Order follow.

Section C.2.10 of the Contract provides that

> [t]he supplier must have adequate contingency plans in place[,] *should the use of postal facilities be terminated or limited. In no event shall the [USPS] be held liable for, or incur any additional cost associated with, such use or the termination of such use during the contract term*.

Gov't App. A26 (emphasis added).

Section C.3.1(6) of the Contract provides that the USPS

> may terminate this contract, or any part hereof, for default by the supplier, or if the supplier fails to provide the [USPS], upon request, with adequate assurances of future performance.

Gov't App. A27.

Section C.3.4(j) of the Contract provides that

> *[t]he supplier must proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract*, and comply with any decision of the contracting officer.

Gov't App. A32 (emphasis added).

In addition, Section C.3.8 of the Contract, provides, as a ground for termination for cause:

> a. The supplier's failure to perform service according to the terms of the contract[.]

Gov't App. A34.

---

and the Appendix attached thereto ("Pl. App. A1–18"); and Ms. Jennings' December 14, 2015 Response To Defendant's Proposed Findings Of Uncontroverted Fact ("PRGPFUF").

**B. Relevant Facts.**

On January 18, 2013, the Contracting Officer sent Ms. Jennings a letter denying her "access to the mail and facilities . . . based on a disqualifying event in the course of contract performance." Am. Compl. Ex. 5. The Notice of Temporary Denial of Access stated that:

> On January 18, 2013, you conducted yourself in an unprofessional manner and disrupted the mail processing operations at the Leslie post office.
>
> Consequently, I am temporarily denying you further access to the mails and all Postal Facilities. This temporary denial of access is pending further investigation in the matter and will remain in effect until you receive further correspondence from this office. You are afforded an opportunity by notice of this letter to present in writing any information that you believe to be material to this incident and would like for me to consider when making my final decision in the matter. Any such information is to be submitted to this office **no later than Friday, January 25, 2013**. You will be notified when a permanent decision has been made.
>
> - If you have not already done so, you are instructed to return the drivers ID badge to the Administrative Official.
> - By copy of this letter, the US Postal Inspection Service is made aware of this decision.
>
> Despite the temporary denial of access to the mail, *it is still your responsibility to ensure that service is provided on this contract. Failure to do so may result in other action, including a contract termination for default.*

Am. Compl. Ex. 5 (bold in original) (emphasis added).

On January 25, 2013, Ms. Jennings responded to the Contracting Officer's Notice. Gov't App. A73–76.[2]

On February 14, 2013, the Contracting Officer issued a letter permanently denying Ms. Jennings access to the Postal facilities. Am. Compl. Ex. 7. The following reasons were cited:

> On January 18, 2013, you were issued a temporary denial of access to the mails and Postal facilities. The temporary denial of access referenced an option for you to

[2] Ms. Jennings' email to the Contracting Officer is attached as Court Exhibit A. In addition, two affidavits of other USPS employees directly contradict the Contracting Officer's conclusion that Ms. Jennings "conducted [herself] in an unprofessional manner and disrupted the mail processing operations[.]" *Compare* Am. Compl. Ex. 5, *with* Pl. App. A10, A11–12, attached as Court Exhibit B. Since material facts are at issue as to whether the Contracting Officer's February 21, 2013 termination was lawful, the Government's November 13, 2015 Motion For Summary Judgment is denied.

> respond by January 25, 2013. Your response to the temporary denial of access was received via email on January 25, 2013.
>
> Your response, as well as the background information we received from local Postal officials, appears to indicate that in at least two separate instances on January 18, 2013, you refused to follow instructions provided by an authorized Postal Service supervisor. In addition, it appears that you allowed an unauthorized person to gain access to the mails,[3] which is disruptive to our operations and violates the terms of your contract. Finally, your response does not provide any indication that you would attempt to avoid these occurences [sic] in the future.
>
> Consequently, *I am permanently denying you access to the mails and all Postal Facilities*. This permanent denial is effective immediately.
>
> - If you have not already done so, you are instructed to return the ID badge to the Administrative Official.
> - By copy of this letter, the US Postal Inspection Service is made aware of this decision.
>
> You may appeal this Denial of Access decision within five (5) days of receipt of this letter under Management Instruction PO-530-2009-4, Section 172, Appeal Process Related to the Investigation of a Contracting Officer. Your appeal letter should be mailed to the contracting officer at the address shown at the bottom of this letter. The contracting officer will then forward your letter to the Manager, Surface Transportation.

Am. Compl. Ex. 7 (emphasis added).

On February 21, 2013, the Contracting Officer terminated Ms. Jennings for "failure to perform service in accordance with the terms of [the] [C]ontract." Gov't App A66. *The reasons stated by the Contracting Officer for termination, however, were not those listed in the January 18, 2013 Notice of Temporary Denial of Access or the February 14, 2013 Notice of Permanent Denial of Access*. Instead, the Contracting Officer justified Ms. Jennings' termination, because

> you failed to provide a *hired driver*[4] to operate service on [the Contract]. In a telephone conversation later that day, you informed that you would not provide a driver to cover service on February 20, 2013. You failed to operate service on

[3] It appears that the "unauthorized person" was Ms. Jennings' brother who was delivering the mail as a substitute supplier, as required by Section C.2.10 and Section C.3.4(j) of the Contract. Gov't App. A72 (2/8/13 email from Ms. Jennings to the Contracting Officer) (reporting that Postmaster Goshe "ran off [Ms. Jennings'] brother who has been running her route").

[4] Neither the terms "hired driver" nor "unauthorized person" appear anywhere in the forty-eight page Contract. Likewise, the term "contract employee," referred to in Section B.5 of the Statement of Work also is not defined in the Contract.

> February 19 and February 20, 2013, and turned in your keys required to operate service on the route on February 20, 2013.
>
> Therefore, enclosed is your copy of the PS Form 7440 terminating [the Contract] for default. You are liable to the [USPS] for any damages incurred as a result of your default, including excess costs for replacement service on the route. A claim for any such damages may be made in the future, in a separate final decision.
>
> This is the decision of the contracting officer[,] pursuant to the Contract Disputes Act of 1978 and the clause of your contract entitled Claims and Disputes. You may appeal this decision to the Postal Service Board of Contract Appeals by mailing or otherwise furnishing written notice (preferably in triplicate) to the contracting officer within 90 days from the date you receive this decision. The notice should identify the contract by number, reference this decision, and indicate that an appeal is intended. Alternately, you may bring an action directly in the United States Court of Federal Claims within 12 months from the date you receive this decision.

Gov't App. A66 (emphasis added).

Ms. Jennings' termination was made retroactive effective close of business, February 16, 2013. Gov't App. A66.

## II. PROCEDURAL HISTORY.

On February 18, 2014, Ms. Jennings filed a Complaint in the United States Court of Federal Claims, alleging that: (1) the actions taken by the USPS constitute a wrongful breach of contract for which Plaintiff is entitled to $11,333.33, pursuant to the liquidated damages clause of the Contract; (2) the USPS terminated the Contract in bad faith; and (3) Plaintiff is entitled to other monetary damages in the amount of $170,000.00 ("Compl.").

On June 19, 2014, the Government filed a Partial Motion To Dismiss, arguing that Ms. Jennings' claims should be dismissed, because they were not presented to a contracting officer or certified, as required under the Contract Disputes Act ("CDA").

On July 18, 2014, Ms. Jennings filed a Motion For Leave To File Amended Complaint, that the court granted on July 21, 2014.

On July 21, 2014, Ms. Jennings filed an Amended Complaint, alleging that the claims in the February 18, 2014 Complaint are the same in the July 21, 2014 Amended Complaint, with the exception of a claim alleging that Ms. Jennings is entitled to damages in the amount of $56,666.67 for the bad faith termination of the Contact. On August 7, 2014, the Government filed an Answer.

On November 13, 2015, the Government filed a Motion For Summary Judgment, attaching a Proposed Findings Of Uncontroverted Fact. On December 14, 2015, Ms. Jennings filed a Response, together with a Response To Defendant's Proposed Findings Of Uncontroverted Fact. On January 13, 2016, the Government filed a Reply ("Gov't Reply").

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act authorizes the United States Court of Federal Claims "to render judgment upon any claim by or against, or dispute with, a contractor arising under [the Contracts Dispute Act ("CDA")] section 7104(b)(1) of title 41, including a dispute concerning termination of a contract . . . on which a decision of the contracting officer has been issued under [the CDA]." 28 U.S.C. § 1491(a)(2).

The CDA provides that if a contractor has a claim against the Government, based on a contract with the United States, the contractor first must submit a claim, in writing, to the contracting officer responsible for that contract. *See* 41 U.S.C. § 7103(a). If the contracting officer issues a final decision adverse to the contractor, the aggrieved contractor may bring an action directly on the claim in the United States Court of Federal Claims. *See* 41 U.S.C. § 7104(b)(1). Any such action must be filed within twelve months of receipt of the adverse contracting officer's final decision. *See* 41 U.S.C. § 7104(b)(3).

On February 21, 2013, the Contracting Officer issued a "'final decision' . . . pursuant to the Contract Disputes Act of 1978 and the clause of [the] [C]ontract entitled Claims and Disputes." Gov't App. A66. As such, the Contracting Officer deemed Ms. Jennings' January 25, 2013 communication as a CDA claim. On February 18, 2014, Ms. Jennings timely filed a Complaint in the United States Court of Federal Claims, alleging wrongful termination and seeking $170,000 in damages, plus attorneys' fees. Am. Compl. ¶¶ 15, 17. With the consent of the Government (ECF No. 12), an Amended Complaint was filed on July 21, 2014, alleging wrongful termination, but $68,000 in damages, plus attorneys' fees. Gov't App. A31.

For these reasons, the court has determined that it has jurisdiction to adjudicate the claims alleged in the July 21, 2014 Amended Complaint. Accordingly, the Government's June 19, 2014 Partial Motion To Dismiss is denied.

### B. Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit[.]" *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan*, 504 U.S. at 560–61. Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citations omitted).

The July 21, 2014 Amended Complaint alleges that Ms. Jennings suffered monetary injury that is concrete, particularized, and fairly traceable to the Contracting Officer's February 21, 2013 termination of the March 9, 2012 Contract. Am. Compl. ¶¶ 16–18. Any financial injury

established by Ms. Jennings also can be redressed by a monetary award. For these reasons, the court has determined that Ms. Jennings has standing to seek an adjudication of the claims alleged in the July 21, 2014 Amended Complaint.

### C. Whether Sections C.2.10, C.3.1(6), and C.3.4(j) Of The March 9, 2012 Contract Are Unenforceable.

In *Fomby-Denson v. Dep't of the Army*, 247 F.3d 1366 (Fed. Cir. 2001), the United States Court of Appeals for the Federal Circuit, discussing precedential cases from the United States Supreme Court, described the analysis that the trial court should follow when determining whether it should enforce a government contract, where "enforcement would be contrary to the 'public policy of the United States as manifested in the Constitution, . . . federal statutes and applicable legal precedents.'" *Id*. at 1374 (quoting *Hurd v. Hodge*, 334 U.S. 24, 35 (1948)). Our appellate court advised, first "there is the rule that the federal courts should refrain from enforcing . . . United States government . . . contracts when such enforcement would be contrary to the 'public policy of the United States as manifested in the Constitution [and] federal statutes[.]'" *Fomby-Denson*, 247 F.3d at 1375 (quoting *Hurd*, 334 U.S. at 35).

In the alternative, the federal courts should

> refuse to enforce contracts where the public policy is reflected in "applicable legal precedents." In other words, the federal courts, as a matter of contract law, will not enforce an agreement if the agreement would require violation of established public policy norms, even if enforcing the agreement would not violate specific federal statute . . . or constitutional requirement. This principle has particular force in cases involving United States government contracts where federal contract law is applied, *see Boyle v. United Techs. Corp*., 487 U.S. 500, 512 (1998)[.]

*Fomby-Denson*, 247 F. 3d at 1375 (quoting *Hurd*, 334 U.S. at 35).

This case concerns the second category of contract. The contract in this case includes three provisions, if enforced as a basis for termination, change the nature of an employment agreement into a contract of adhesion, where "there is great disparity in bargaining power, and where [one party] receives nothing for the . . . provision[.]" *Fuentes v. Shevin*, 407 U.S. 67, 94 (1972) (quoting *D.H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 188 (1972)). Specifically, these provisions are ambiguous, are not supported by adequate consideration, and impose an unreasonable burden on due process.

Section C.2.10 of the Contract requires the supplier to have "adequate *contingency plans* in place[,] *should the use of postal facilities be terminated or limited.*" Gov't App. A26 (emphasis added). The term "adequate contingency plans" is ambiguous and not defined anywhere in the forty-eight page Contract. In addition, this provision does not specify the circumstances under which the USPS lawfully may terminate or limit access to a Postal facility or for how long any such termination or limit to access could last—one week, one month, one year, or longer? More importantly, this provision provides that: "In no event shall the [USPS] be held liable for, or incur any additional cost associated with, such use or termination of such use during the contract term." Gov't App. A26. In effect, all costs of a unilateral USPS decision to terminate or limit access are

imposed on the supplier for the term of the Contract—clearly an unreasonable financial burden and obligation unsupported by consideration—a fatal defect to which the court will return.

Section C.3.4(j) of the Contract requires that the supplier must perform or provide substitute performance during the entire period that "any request for relief, claim, appeal or action arising under the contract" is pending. Gov't App. A32. Again, this provision affords the USPS the unilateral ability to impose an unreasonable financial obligation on a supplier who elects to exercise their due process rights in court to challenge any aspect of the Contract. This imposition is analogous to the constitutionally banned practice of allowing the garnishment of wages prior to a court rendering judgment on the validity of a debt—a practice that the United States Supreme Court has held violates the fundamental principles of due process. *See Sniadach v. Family Fin. Corp. of Bay View*, 395 U.S. 337, 342 (1969); *see also North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 607 (1975) (holding, as an unconstitutional burden of due process, the practice of allowing a creditor to impound the bank account of an alleged debtor, based on an affidavit containing "only conclusory allegations . . . without participation by a judge," and "no provision for an early hearing"). Similarly, Section C.3.1(6) of the Contract requires that the supplier assure the USPS that the supplier will assume continued performance and bear the entire cost of performance under Section C.2.10 or Section C.3.4(j), or risk termination for default. Of course, a termination for default will have a significant adverse impact on a supplier's ability to be hired for other federal jobs or one in the private sector.

In this case, Ms. Jennings entered into the March 9, 2012 Contract to perform the services of a rural mail carrier provider for which she was paid $34,000 per year. Under Sections C.2.10, C.3.1(6), and C.3.4(j), however, Ms. Jennings also was required to assume potential liability of approximately $238,000 if she decided to exercise her due process rights to bring an action under the Contract, **or** risk being terminated for default. As the RESTATEMENT (SECOND) OF CONTRACTS § 79 cmt. e (1981) states, such gross inadequacy of consideration "'shocks the conscience' [and] is often said to be a 'badge of fraud,' justifying a denial of specific performance." *Id.*; *see also id.* § 78 cmt. c ("*Unenforceable promises*. A promise may be unenforceable by reason of lack of consideration or public policy[.]"); *Id.* § 86(2)(b) ("A promise is not binding . . . to the extent that its value is disproportionate to the benefit.").

## IV. CONCLUSION.

For the reasons discussed herein, the Government's June 19, 2014 Partial Motion To Dismiss and November 13, 2015 Motion For Summary Judgment are denied. The Government is ordered, within thirty days after issuance of this Memorandum Opinion And Order, to show cause why the court should not determine that Sections C.2.10, C.3.1(6), and C.3.4(j) of the March 9, 2012 Contract are unlawful and unenforceable.[5]

---

[5] If Ms. Jennings' February 21, 2013 termination was unlawful, later discovered evidence that she did not have required insurance coverage at all times may support a termination on other grounds. But, the fact that Ms. Jennings had no prior performance issues and voluntarily acted in a prompt manner to cure the situation would appear to warrant further consideration by the Contracting Officer. In any event, Ms. Jennings did not have an opportunity to submit a claim on

Aside from Ms. Jennings' case, the court is concerned that the boilerplate terms in Sections C.2.10, C.3.1(6), and C.3.4(j) may have been invoked in other cases to terminate USPS employees. Therefore, the court will convene a status conference on July 8, 2016 at 717 Madison Place, N.W., Washington, D.C. at 1:30 pm EST to hear argument on the Show Cause Order and whether a permanent injunction is warranted, in the event the court determines these contract provisions to be unlawful. In addition to trial counsel for the Department of Justice, the court orders the attendance of Thomas J. Marshall, General Counsel and Executive Vice President of the United States Postal Service. Counsel for Ms. Jennings may participate by telephone conference to avoid the expense of travel.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

which the Contracting Officer could issue a final decision under the CDA on this basis. Therefore, those issues are not properly before the court.

Court Exhibit A

ja_simpsonlaw@sbcglobal.net

This e-mail message may contain privileged, confidential and/or proprietary information of Simpson Law Firm. If you believe that it has been sent to you in error, please contact the sender immediately and delete the message including any attachments, without copying, using, or distributing any of the information contained therein. This e-mail message should not be interpreted to include a digital or electronic signature that can be used to authenticate an agreement, contract or other legal document, nor to reflect an intention to be bound to any legally-binding agreement or contract.

---

**From:** Harris, Keith L - Memphis, TN [mailto:keith.l.harris@usps.gov]
**Sent:** Wednesday, February 06, 2013 2:16 PM
**To:** Jimmy Simpson
**Subject:** RE: Tabetha Jennings

Thank you Jimmy

Keith Harris C.P.M.
Southern TCMT
901-747-7309

---

**From:** Jimmy Simpson [mailto:ja_simpsonlaw@sbcglobal.net]
**Sent:** Wednesday, February 06, 2013 2:14 PM
**To:** Harris, Keith L - Memphis, TN
**Subject:** Tabetha Jennings

Keith

Here is Tabetha's response. Was sent to me January 25, 2012.

Subject: HCR 726A1 response to denial of access to mails and postal facilities - Tabetha Jennings

I would like to take the oppertunity to explain my side to my alleged conducting myself in an unprofessional manner and disrupting the mail processing operations at the Leslie Post Office on January 18, 2013.

This all started December 10, 2012 when the Post Master at Timbo Post Office elected to send one package to Onia Post Office to go out in said office's dispatch, because there were a lot of oversized packages that day. That one package would not fit in my 2008 Jeep Wrangler. Instead of me making an extra trip and costing the Postal Service money it made sense to send the one package to another office. The dispatch for Onia goes to Marshall Post Office were Elora Goshe is post master.

Elora Goshe from that point had me call her on December 13, 2012. Elora Goshe informed me that she had measured her Jeep and she only had 84 cubic feet and my contract calls for me to have 90 cubic feet ( Elora's Jeep is a TJ which is older, shorter, and narrower than my JK). Elora told me I would not be paid for extra trips with this vehicle, I informed her it had been measured when I bought it by the Leslie post master and I would be getting paid. Elora proceeded to tell me she was going to write me up for failure to pick up all the mail on December 10, 2012. I told her to write me up then and hung up. I then called Memphis and was told I could get a vehicle inspection and if I

was written up I would have a chance to respond. I was told by Memphis that did not make me a bad carrier and not to worry about it. I also called Elora's supervisor Mark Merrit he told me that I could not be written up for something that the Timbo Post Master had approved, and if my vehicle was not the 90 cubic feet then it could be as simple as having my contract changed to what my Jeep compacity is if it was the 84 like Elora thought. I have measured and it is 92 cubic feet.

On December 20, 2012 Elora came to Timbo Post Office again my vehicle size was an issue she threatened me on several different things, then she left and came back. Elora conducted her business with me from the lobby talking over the counter in front of Post Master Jenelle Passmore and carrier Dianne Balentine. Elora ordered Janelle Passmore to go look and see if my front seat was in my Jeep. Then she threatened to terminate my contract for having my front passenger seat in. Keep in mind I have had no problem hauling the all the mail and was not claiming an extra trip but still she had a problem with my vehicle size. There is also another Jeep same as mine just a different color contracted out of Leslie with the same 90 cubic feet requirement as myself and she has no fault with it. Again I called her supervisor Mark Merrit and asked if he would do something about her. It was Christmas one of our bussiest times of the year stressful enough without her adding to it.

January 14,2013 I returned to Leslie Post Office after delivering mail the PMR Dylan Pinson informs me Elora said I have to be at Leslie at 7:30 am from now on. My contract time is 8:00 am. I inform him and the Timbo Post Master that there is no way I can make it at an earlier time, I have a child I have to get to school and would need proper time to make arrangements.

January 15,2013 I arrive at Leslie Post Office at 8:00 am and Elora is waiting on me. Elora calls me outside and proceeds to chew me out for not coming in at 7:30 am she had given me a direct order. I tried to explain to her that I had a child to get to school and could not make arrangements in less than 24 hrs for him. She informed me it was my responsibility to be there when she said or have someone come in for me. I told her my contract said 8:00 and I was there at said time. She threatened me with a vehicle inspection. I told her ok I was driving my back up vehicle my Jeep was in the shop getting a transmission put in. Then she asked for my badge I had left it at home that day. Elora told me I was a bad carrier and she should dock my pay. I guess I smiled or something cause she asked me what I thought was funny and lets just go ahead with that vehicle inspection so I said ok. She inspected my vehicle my door handle was loose but it still locks. She told me I had to get it fixed if I was going to drive it. She then told me to clean up my case today when I got in and to clean my case at Timbo they were a mess. My case at Leslie and Timbo was fine even the Timbo Post Master said she saw nothing wrong with my case at her office. I called Memphis about this incident. I was told my contract had not changed and I had to be there at 8:00 am, also no one could turn on a dime and to explain to Elora I needed proper time to prepare. I told Memphis that I had tried and she was harassing me, and that I was at the point of calling an attorney about this harassment. I explained how I had the same vehicle as another carrier with the same requirements and she had no problem with theirs and that no one else had a vehicle inspection that she had personally singled me out. Nothing was done about Elora.

On January 18,2013 I arrive at Leslie at 8:00 am load and case mail to start my work day. PMR Dylan Pinson tells me Elora needs a copy of my insurance, I have never had to give my insurance to

anyone except Memphis. I told him I would fax it to Memphis. Elora wanted to talk to me on the phone I refused to talk to her and continued doing my job. Dylan said for me not to leave :Leslie Elora was on her way I told Dylan I was going to go to do my route and take mail to Timbo that I did not want to delay the mail nor have a confrontation with Elora. I was tired of her singling me out, bullying and harassing me, and it was just me, Dylan said he knew it was just me but she said for me to stay. I went ahead and left to do my job. Elora called Timbo told them to lock me out and not let me in and if I tried to get in to call the cops. When I got to Timbo I had a deputy there for a witness and my safety. I showed the deputy my insurance at that time Mario Taylor was on the phone I talked to him he told me to show Elora my insurance. I went to show her I grabbed the wrong card. She said it was expired I went to take it from her hand and she drew it to her and said no I am making a copy of this.... At this point my nerves are shot. I go to get the right card I can not find it later I discovered I had droped it between my seat and the console but with the stress of the situation I just couldnt see it. I go in to the post office and start to help sort mail, Elora ask me if I have her personal cell phone number I tell her I do not. She writes it on a piece of paper and tells me here is my number in case you want to talk to me about anything later today. Elora then tells me to do what I need to do and leaves. Elora then returns and Mario Taylor either calls or she calls him and I am to talk to him on the phone. Mario Tayor informs me I am suspended and to turn in my badge and leave the post office so I did.

I feel Elora Goshe has personally singled me out and she is veneful and vindictive toward because other carriers have the same vehicle as me yet she finds no fault. There are other carriers that have never been issued a badge and she has no problem with them yet I forget mine one day and I am in trouble. Other carriers have major cosmetic defects with their vehicle yet she says nothing to them. She tried to deviate from my contract without proper notice or procedure and then threatened me for not doing it, when I have a child to get to school.

I have delivered mail for 7 years and never been even written up. I do my job to the best of my ability, I do not miss and have had no problems until Elora Goshe. I ask that you consider all of this when making your decision. I feel Elora Goshe is the one trying to disrupt the mail processing operations and acting in an unprofessional manner at Leslie Post Office and Timbo Post Office on all dates above.

Thank you ,

Tabetha Jennings

James A. Simpson, Jr

**Simpson, Simpson &Mercer**
(501) 279-9292 (O)
(501) 279-0808 (F)
ja_simpsonlaw@sbcglobal.net

# Court Exhibit B

Tabetha Jennings (mail carrier) picked up the dispatch mail 12/10/12. She had one package that would not fit into her Jeep with the rest of the packages.
It was my decision to send this package to Ona Post Office with the other carrier so the customers package would go out that day. It was already scanned as accepted in the system.
My decision was so Tabetha would not have to come back for one pkg & charge the postal system for an extra trip.
Tabetha was doing what she was told to do by me (administrative official for Timbo office)

Jenell Passmore
9/27/13

Diana Balentine
1489 Lawrence Rd.
Onia, AR 72663
(870) 746-4466
January 23, 2013

TO WHOM IT MAY CONCERN:

I am writing in reference to an incident I witnessed at the Timbo Post Office, in Timbo, AR.

It was a confrontation between an HCR contract carrier, Tabetha Jennings, and Elora Goshe.

On or about December 20th, as we were casing the mail in the Timbo Post Office, Elora entered, and confronted Tabetha about her Jeep. She was apparently complaining about the size of her Jeep, the year model, style, and whether or not Tabetha had her front seat in the vehicle. Tabetha was very compliant with her, answering every question she asked. She wanted to know the inside size, and Elora stated that she (Elora) had a jeep, and it didn't have the correct amount of room inside as required by the postal department. This is the same jeep that Tabetha has used and that was in compliance since she first got it. Tabetha told her that she had a different body style than Elora had, and that it had always been in compliance before. Elora said she needed to prove that it had the space that she said it did. Other rural mail carriers have the same Jeep, and theirs appears to be in compliance, but yet she didn't think Tabetha's was.

She even went so far as to have the Postmaster of Timbo, Jenell Passmore to go outside and verify that she had the front passenger seat in, which she had to stop sorting the mail to do. On more than one occasion she threatened to write her up, or terminate her contract for her jeep not being in compliance, and because she had her front seat in. She was so intent on proving that she had her front seat in.

This seemed very inappropriate to confront Tabetha in front of all of us, and find such fault with her. If she had taken it outside, or confronted her at another place instead of in front of us all, it might not have seemed so bad, but it seemed very unprofessional to me. I was very surprised to see Tabetha keep her cool like she did. I'm afraid I might have raised my voice, or maybe

even cussed her if I had been treated like that, and I don't use bad language. Elora just seemed to be very rude and arrogant toward her.
I know this happened, because I was there. I am a substitute mail carrier for another HCR contract carrier out of the Timbo Post Office.
I am also a business owner myself, and would never confront an employee of mine in a manner like that.

Diana Balentine